**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
)
**VANIA PAUL,**                                   )
                                                  )
       **Plaintiff,**                       )      **Civil Action No.**
                                                  )      **20-10108-FDS**
    **v.**                                 )
                                                  )
**ANDREW SAUL, Commissioner,**                    )
**Social Security Administration,**               )
                                                  )
      **Defendant.**                      )
_____)

**MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION**
**FOR ORDER REVERSING THE COMMISSIONER'S DECISION AND DEFENDANT'S**
**MOTION FOR ORDER AFFIRMING COMMISSIONER'S DECISION**

**SAYLOR, C.J.**

This is an appeal from the final decision of the Commissioner of the Social Security

Administration denying an application for social security disability insurance ("SSDI") benefits.

Plaintiff Vania Paul alleges that she became disabled on October 23, 2016, after various

impairments rendered her unable to work.  She submitted medical records indicating that she

suffers from various ailments, including back pain and depression.  She now disputes the

Commissioner's holding that she is not "disabled" within the meaning of the Social Security Act.

Pending before the Court is Paul's appeal and the Commissioner's motion to affirm.  For

the reasons stated below, Paul's motion to reverse and remand will be denied and the

Commissioner's motion to affirm will be granted.

**I.**    **Background**

The following is a summary of the evidence as stated in the administrative record

("A.R.") and the parties' relevant memoranda.

### A.    Education and Occupational History

Vania Paul was born on July 10, 1968, and is currently 52 years old.  (A.R. 1625).  She has a high-school education and has completed some college.  (*Id.* at 1625, 1671).  She alleges that her disability began on October 23, 2016, and that she has not engaged in any substantially gainful activity since the alleged onset date.  (*Id.* at 1617).  On July 19, 2017, at the age of 48, she filed an application for disability insurance.  (*Id.* at 1615, 1762-63).

Prior to the onset of her disability, Paul worked as a respiratory therapist.  (*Id.* at 1625).  A respiratory therapist is listed in the Dictionary of Occupational Titles ("DOT") as a medium exertion and skilled position with a Specific Vocational Preparation of 6.  (*Id.*).  She reported that she has not worked since October 23, 2016.  (*Id.* at 1617).  She briefly returned to work after the September 12, 2016 incident that she contends caused her disability, but then left work again on Family and Medical Leave Act ("FMLA") leave.  (*Id.*).

### B.    Medical History

Prior to the alleged onset of her disability, Paul had a history of back pain but was able to work.  (*Id.* at 1620).  Medical records from Dedham Medical Associates indicate that in November 2014, she was being treated for lower-back pain with radiation after a motor-vehicle accident that occurred in July 2014.  (*Id.* at 1620-21).  She was being treated with a medication regimen to provide pain relief.  (*Id.* at 1621).  The following month, Dr. Qiao Ting Kuang noted that her right-side leg pain was improving with chiropractic treatment.  (*Id.*).

An MRI conducted in October 2014 revealed a small right paramedian disc herniation with subtle mass effect on the right SI nerve root around the level of L5-SI.  (*Id.*).  That MRI presented similar results to a scan conducted in February 2012.  (*Id.*).  In December 2014, Dr.

Jennifer Millen examined Paul and recommended that medication as well as injection would be beneficial.  (*Id.*).  In January 2015, Paul received a right S1 epidural steroid injection.  (*Id.*).

On May 13, 2015, Nurse Practitioner Hazel Dunn reported that Paul had been out of work for several weeks and had tenderness in her lower back.  (*Id.*).  Her leg numbness, however, had been resolved with Neurontin, and her dosage of Percocet was decreased.  (*Id.*).

In July 2015, Dr. Kuang examined Paul again and noted that she reported that she was still experiencing pain.  (*Id.*).  Her prescription for Naproxen had been changed to Mobic, which helped reduce her use of Percocet.  (*Id.*).  Following that appointment, she was instructed to stop taking Percocet and instead take morphine and also Oxycodone as needed.  (*Id.*).

On September 12, 2016, the accident occurred that caused her alleged disability.  (*Id.*).  Paul had been attempting to sit in a chair but missed and fell to the ground.  (*Id.*).  She was treated at the Carney Hospital emergency room for complaints of right lower-back pain radiating down her legs after falling at work.  (*Id.*).  There was no head injury or loss of consciousness.  (*Id.*).  A musculoskeletal examination revealed that she had a full range of motion and no deformity with only mild lumbar tenderness.  (*Id.*).  Lumbar x-rays were also negative.  (*Id.*).  A MRI showed a mild disc bulge at L5-S1 contacting and potentially irritating the bilateral S1 nerve roots in their lateral recesses, along with mild left facet degenerative joint disease that was producing mild left foraminal stenosis and potentially irritating the left L5 nerve root as well.  (*Id.*).  After several hours of observation, Paul reported improvement in her condition.  (*Id.*).  She had full range of motion, was neurovascularly intact, and her strength was intact.  (*Id.*).  She was diagnosed with sciatica, prescribed Percocet, and advised to follow-up with her primary-care physician.  (*Id.*).

On September 23, 2016, Dr. Michael Gieger of Neurosurgical Consultants saw Paul for

complaints of constant lumbar region pain in the midline and on the right.  (*Id.*).  An examination

of her upper and lower extremities showed normal inspection and palpation, range of motion,

muscle strength, tone, and stability.  (*Id.*).  Dr. Gieger diagnosed spondylosis with radiculopathy

in the lumbosacral region and right-sided sciatica, and recommended a L5-S1 facet block and

transforaminal epidural steroid injection at the right L5-S1 region.  (*Id.* at 1622).  Her immediate,

recent, and remote memory appeared normal.  (*Id.*).  Her mood and affect were also normal and

appropriate for the situation.  (*Id.*).  Dr. Gieger did not notice any difficulties with judgment and

insight, and her capacity for sustained mental activity and abstract thinking showed no

abnormalities.  (*Id.*).

At a return visit on November 22, 2016, Paul reported significant pain.  (*Id.*).  At a visit

on December 23, 2016, she reported walking with a cane.  (*Id.*).

On January 11, 2017, Paul was seen by Dr. James Nairus for an independent medical

examination.  (*Id.*).  During her examination, she reported that she had not received spinal

injections to treat her pain, although Dr. Gieger had referred her to a pain specialist.  (*Id.*).  She

also stated that she was not currently undergoing active treatment and had not received specific

treatment since the work injury in September 2016.  (*Id.*).  She was taking Cymbalta for

depression and Ultram for pain.  (*Id.*).  She reported that she was still experiencing right lower-

back pain that radiated on the right from her buttock to her foot.  (*Id.*).  After examination, Dr.

Nairus noted right paraspinal tenderness.  (*Id.*).  Paul would not flex her lumbar spine at the waist

when asked.  (*Id.*).  She had diffuse weakness with 4/5 strength in all muscle distributions in the

right lower extremity that, according to Dr. Nairus, did not appear to fit into any specific nerve

root distribution.  (*Id.*).  Dr. Nairus also noted possible symptom magnification.  (*Id.*).  Paul had

normal strength in her left extremities, normal sensation in all dermatomes, and normal

symmetric reflexes in both lower legs.  (*Id.*).  Dr. Nairus noted she was positive for sciatica in her right leg.  (*Id.*).  He diagnosed chronic lower-back pain with lower-extremity radicular symptoms from a degenerative disc and a mild bulge at the level of L5-S1, and recommended lumbar spine injections.  (*Id.*).

In January 2017, Dr. Gieger suggested an anterior lumbar interbody fusion.  (*Id.*). Pending workers compensation approval, he recommended an epidural steroid injection.  (*Id.*). At that time, Paul again reported walking with a cane.  (*Id.*).  A motor examination showed full and symmetrical muscle strength, tone, and size throughout all extremities.  (*Id.*).

On April 27, 2017, Paul reported falling three times in the past weeks.  (*Id.*).  However, through August 11, 2017, Dr. Gieger's recommendations remained unchanged, and Paul reported progressing pain or stable pain.  (*Id.*).  On October 6, 2017, Dr. Gieger noted that only pain management had been approved by workers compensation and not surgical intervention.  (*Id.*).

On October 12, 2017, Paul underwent an independent medical evaluation by Dr. Francis Rockett.  (*Id.*).  Dr. Rockett noted that Paul was being treated by Dr. Gieger and was being provided epidural steroid injections by Dr. Joel Golden.  (*Id.*).  Dr. Golden had also prescribed Cymbalta.  (*Id.*).  A motor examination revealed Paul's station was even and steady. Nevertheless, she was not able to perform heel walking and toe walking without support.  (*Id.*). She had 4/5 muscle strength in her right lower extremity but had full muscle strength in her other extremities.  (*Id.*).  She also had somewhat decreased reflexes.  (*Id.*).  Dr. Rockett administered an Oswestry Low Back Pain Questionnaire to help determine if she was exaggerating her symptoms.  (*Id.* at 1623).  Dr. Rockett believed that the injury she sustained on September 12, 2016, was minor and temporarily exacerbated the symptoms of a pre-existing degenerative joint disease and bulging of her disc.  (*Id.*).  He also noted that her subjective reports were not

confirmed by the objective physical findings, in light of the fact that the MRI scans did not reveal any changes to the condition of her spine from 2012 to 2016. (*Id.*). Her diffuse weakness could not be explained by the MRI results, and indicated that she would not benefit from surgery. (*Id.*). Dr. Rockett believed that she had reached maximum medical improvement. (*Id.*).

On February 1, 2018, Paul was examined by Dr. Michael Bohnert, who diagnosed an unspecified moderate depressive disorder. (*Id.*). She reported that she did not experience crying but felt depressed when she was limited by her back pain. (*Id.*). Her pain also disturbed her sleep. (*Id.*). She expressed sadness, low energy, and impaired concentration. (*Id.*). She reported no history of any psychiatric hospitalization, was not in treatment with a physician or therapist, and was not being prescribed any psychotropic medication. (*Id.*). There was also no evidence of psychosis, no difficulty with appetite, and no reported history of hallucinations or delusions. (*Id.*). She reported suicidal ideation in February 2017 after losing her home but denied current or recent suicidal intents or plans. (*Id.*). Overall, Dr. Bohnert concluded that her prognosis was favorable with treatment. (*Id.*).

### C.    RFC and Related Opinions

As noted, on January 11, 2017, Paul was evaluated by Dr. Nairus, an independent medical examiner. (*Id.* at 1625). Dr. Nairus opined that Paul could not lift or carry more than ten pounds occasionally and twenty pounds frequently, and that she could not perform any repetitive bending or stooping. (*Id.*). He diagnosed degenerative disc disease in her lumbar spine and noted that she had signs and symptoms associated with that condition. (*Id.*). Dr. Nairus concluded that Paul was temporarily partially disabled. (*Id.*).

In February 2018, Joseph A. Whitehorn, Ph.D., conducted an examination and found that Paul could lift and carry twenty pounds occasionally, and ten pounds frequently. (*Id.* at 1673).

Dr. Whitehorn also opined that she could sit for six hours and stand or walk for two hours in an eight-hour day.  (*Id.*).  She could not climb ladders, rope, or scaffolding but could occasionally perform other postural action.  (*Id.* at 1674).  He also advised that she should avoid concentrated exposure to hazards.  (*Id.* at 1675).  He also opined that she had "some depression and would be preoccupied with chronic pain," but could perform simple tasks, tolerate minimum social demands of simple-task settings, and could tolerate simple changes in routine.  (*Id.* at 1676-77).

After the initial consideration stage of her claim for SSDI benefits, Paul was declared "not disabled."  (*Id.* at 1679).  She was found to be capable of sedentary work, and after considering her education level, RFC, and age, the medical examiner concluded that she could adjust to other work.  (*Id.* at 1677-78).

In May 2018, at reconsideration, Dr. Uma P. Chelvan concluded that Paul could lift and carry twenty pounds occasionally, and ten pounds frequently.  (*Id.* at 1625, 1689).  Dr. Chelvan also opined that she could sit for six hours and stand or walk for two hours in an eight-hour day, and that she could push and/or pull, including operation of hand and/or foot controls.  (*Id.* at 1689).  Dr. Chelvan noted that Paul could not climb ladders, rope, or scaffolding, but could occasionally perform other postural actions.  (*Id.* at 1625, 1690).  Dr. Chelvan also advised that she should avoid concentrated exposure to hazards.  (*Id.* at 1625, 1691).

Dr. Russell Phillips conducted a psychological evaluation of Paul at reconsideration.  (*Id.* at 1692-93).  Dr. Phillips noted that there did not appear to be any worsening of her mental condition, and opined that considering her mental impairment only, Paul would be able to persist at simple tasks over time under ordinary conditions.  (*Id.* at 1693).

At reconsideration, Paul was again declared to be "not disabled."  (*Id.* at 1695).  She was found to be capable of sedentary work, and after considering her education level, RFC, and age,

the medical examiner concluded that she could adjust to other work.  (*Id.* at 1694).

        **D.**      **Procedural History**

On July 19, 2017, Paul filed for SSI benefits, alleging that she became disabled on October 23, 2016.  (*Id.* at 1615).  The Commissioner denied her claim both initially on February 6, 2018, and upon reconsideration on May 31, 2018.  (*Id.* at 1697-99, 1705-07).  Thereafter, Paul filed a written request for hearing on July 6, 2018.  (*Id.* at 1708-09).  The hearing was held on January 7, 2019.  (*Id.* at 1726).  Paul appeared and testified at the hearing.  (*Id.* at 1634-35).  Amy Vercillo, a vocational expert, also testified at the hearing.  (*Id.*).  On January 23, 2019, the ALJ concluded that Paul was not disabled.  (*Id.* at 1627).

Paul requested a review of the ALJ's decision.  (*Id.* at 1759-60).  On December 17, 2019, the Appeals Council declined to review the decision and adopted it as the final decision of the Commissioner.  (*Id.* at 1-7).

Paul filed this appeal on June 12, 2020.  (Pl. Mem. at 1).

**II.**      **Analysis**

Paul contends that her RFC, which restricts her to only two hours of standing or walking a day, limits her to only "sedentary" work, and makes her unsuitable for "light" work.  (*Id.* at 7).  Because the ALJ relied on three "light" jobs identified by the vocational expert in his decision, Paul contends that the ALJ's conclusion is inconsistent with her RFC.  (*Id.* at 8-15).  Specifically, she contends that the ALJ erred by failing to resolve the conflict between the occupational evidence provided by the VE and the information in the DOT before relying on the vocational evidence.  (*Id.* at 9-14).  She further contends that the ALJ failed to provide reasonable explanation for how an individual restricted to an RFC that is inconsistent with light work can perform the three "light" jobs identified in his decision.  (*Id.* at 8-14).

Finally, she contends that the error was case-determinative, because she turned 50 on July 10, 2018, and a 50-year-old person who is found to be limited to "sedentary" work is deemed "disabled" under the Medical-Vocational Guidelines (the "Grid rules").  (*Id.* at 1).

### A.   <u>Standard of Review</u>

Under the Social Security Act, this Court may affirm, modify, or reverse the final decision of the Commissioner, with or without remanding the case for a rehearing.  42 U.S.C. § 405(g).  The Commissioner's factual findings, "if supported by substantial evidence, shall be conclusive," *id.*, because "the responsibility for weighing conflicting evidence, where reasonable minds could differ as to the outcome, falls on the Commissioner and his designee, the ALJ."  *Seavey v. Barnhart*, 276 F.3d 1, 9 (1st Cir. 2001) (citation omitted); *see Evangelista v. Sec'y of Health & Human Servs.*, 826 F.2d 136, 143-44 (1st Cir. 1987).  Therefore, "[j]udicial review of a Social Security Claim is limited to determining whether the ALJ used the proper legal standards, and found facts based on the proper quantum of evidence."  *Ward v. Commissioner of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000).

However, the Court may reverse or remand the ALJ's decision if the ALJ ignored evidence or made legal or factual errors.  *See Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings . . . are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."); *Moore v. Astrue*, 2013 WL 812486, at *2 (D. Mass. Mar. 2, 2013) (citation omitted) ("[I]f the ALJ made a legal or factual error, the Court may reverse or remand such decision . . ..").  Accordingly, if the "ALJ failed to record consideration of an important piece of evidence that supports [the claimant's] claim and, thereby, left unresolved conflicts in the evidence, [the] Court can not conclude that there is substantial evidence in the record to support the Commissioner's decision."  *Nguyen v. Callahan*, 997 F. Supp. 179, 183 (D.

Mass. 1998); *see also Crosby v. Heckler*, 638 F. Supp. 383, 385-86 (D. Mass. 1985) ("Failure to provide an adequate basis for the reviewing court to determine whether the administrative decision is based on substantial evidence requires a remand to the ALJ for further explanation."). Questions of law are reviewed *de novo*.  *Seavey*, 276 F.3d at 9.

### B.      Standard for Entitlement to SSDI Benefits

An individual is not entitled to SSI or SSDI benefits unless she is "disabled" within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423(a)(1)(A)(d) (setting forth the definition of disabled in the context of SSDI), *id.* §§ 1382(a)(1), 1382c(a)(3) (same in the context of SSI).  "Disability" is defined, in relevant part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than" 12 months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment must be severe enough to prevent a claimant from performing not only past work, but also any substantial gainful work existing in the national economy.  20 C.F.R. § 404.1560(c)(1).

The Commissioner uses a sequential five-step process analysis to evaluate whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520.  The steps are:

> 1) if the applicant is engaged in substantial gainful work activity, the application is denied; 2) if the applicant does not have, or has not had . . . a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the 'listed impairments' in the Social Security regulations, then the application is granted; 4) if the applicant's 'residual functional capacity' is such that [s]he . . . can still perform past relevant work, then the application is denied; 5) if the applicant, given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

*Seavey*, 276 F.3d at 5; *see* 20 C.F.R. § 404.1520(a)(4).  "The applicant has the burden of production and proof at the first four steps of the process," and the burden shifts to the

Commissioner at step five to "com[e] forward with evidence of specific jobs in the national

economy that the applicant can still perform."  *Freeman v. Barnhart*, 274 F.3d 606, 608 (1st Cir.

2001).  At that juncture, the ALJ assesses the claimant's residual functional capacity in

combination with the "vocational factors of [the claimant's] age, education, and work

experience," 20 C.F.R. § 404.1560(c)(1), to determine whether the claimant can "engage in

any . . . kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

1382c(a)(3)(B).

      **C.**      **The Administrative Law Judge's Findings**

In evaluating the evidence, the ALJ followed the established five-step procedure set forth

in 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ determined that Paul had not engaged in substantial gainful activity

during the period since her alleged disability onset date of October 23, 2016.  (A.R. 1617-18).

At step two, the ALJ addressed the severity of Paul's impairments.  (*Id.* at 1618).  He

concluded she had the following severe impairments:  lumbar spine degenerative disc disease

and depression.  (*Id.*).  Those impairments significantly limited her ability to perform basic work

activities as required by SSR 85-28.  (*Id.*).

At the third step, the ALJ determined that those severe impairments did not meet or

medically equal the requirements of a Listed Impairment under 20 C.F.R. Part 404, Subpart P,

Appendix 1.  (*Id.*).  The ALJ assessed her impairments under Listings 1.04 (spinal disorders) and

12.04 (depressive, bipolar, and related disorders).  (*Id.*).  After consideration of the objective

medical evidence, the ALJ found that she did not meet the specified criteria required of Listing

1.04.  (*Id.*).  The ALJ also concluded that her mental impairment did not meet or medically equal

the criteria of Listing 12.04 because "paragraph B" was not satisfied.  (*Id.*).  She only had a

moderate limitation in the "paragraph B" criteria for concentrating, persisting, or maintaining pace, and in adapting or managing herself. (*Id.* at 1619). Furthermore, she had a mild limitation in the "paragraph B" criteria for understanding, remembering, or applying information, as well as in interacting with others. (*Id.* at 1618-19). Thus, her mental impairments were not sufficiently severe to constitute two marked or one extreme limitation for any of the "paragraph B" criteria. (*Id.*). In addition, she did not satisfy the "paragraph C" criteria because the medical evidence demonstrated that she had more than minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life. (*Id.*).

At step four, the ALJ determined that Paul's RFC precluded her from performing any past relevant work. (*Id.* at 1625). After consideration of the entire record, the ALJ concluded that she has the RFC to perform a "light" level of work as defined in 20 CFR 1010.1567(b), with the following limitations:

> Can lift and carry pounds 20 occasionally and 10 pounds frequently, as well as sit for 6 hours and stand or walk for 2 hours in an 8-hour day. She cannot climb ladders, rope or scaffolding. [She] can occasionally kneel, stoop, balance, crouch, crawl, and climb stairs and ramps. She must avoid concentrated exposure to unprotected heights and dangerous machinery. She can perform simple, routine, and repetitive tasks over an eight-hour workday within a normal break schedule. She can perform simple, routine, and repetitive tasks over an eight-hour workday within a normal break schedule. She can make simple-work related decisions. [She] can tolerate simple routine changes in a work setting.

(*Id.* at 1619). In making that finding, the ALJ noted that he did not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions. (*Id.* at 1619, 1624). He found the opinion of Dr. Nairus, the independent medical examiner, to be generally persuasive, as his assessment of her limitations was generally consistent with the medical record. (*Id.* at 1625). He also found the state agency consultants' medical and psychological assessments to be persuasive. (*Id.*).

The vocational expert characterized Paul's past relevant work as a respiratory therapist as

being a medium exertion and skilled position.  (*Id.* at 1625).  Given Paul's RFC of light work,

with some exceptions, the vocational expert testified that she could not return to her past work.

(*Id.*).  Accordingly, the ALJ concluded that she was unable to perform her past relevant work as

actually or generally performed.  (*Id.*).

At step five, the ALJ considered Paul's age, education, work experience, and RFC.  (*Id.*

at 1626).  Taking all of those factors into account, the ALJ found that a significant number of

jobs existed in the national economy that she could perform.  (*Id.*).  If she had the RFC to

perform the full range of light work, Medical-Vocational Rule 202.21 and Rule 202.14 would

dictate a finding of "non-disabled."  (*Id.*).  Here, however, her ability to perform all, or

substantially all, of the requirements of "light" work was impeded by her additional limitations.

(*Id.*).  Thus, the ALJ turned to the vocational expert to determine whether jobs existed in the

national economy for an individual with her characteristics, particularly her limitations on light

work.  (*Id.*).  The VE testified that a person with her characteristics could work in representative

occupations such as bench inspector, tagger/labeler, and small-products assembler.  (*Id.*).  All

three occupations were described as light exertion and unskilled work.  (*Id.*).  The VE, taking

into account her two-hour standing/walking limitation, found that a significant number of such

jobs existed in the national economy that she was capable of performing.  (*Id.*).  Pursuant to SSR

00-4p, the ALJ determined that the vocational expert's testimony was consistent with the

information contained in the DOT.  (*Id.*).  The ALJ accordingly found that after considering her

characteristics, she could make a successful adjustment to other work that exists in significant

numbers in the national economy.  (*Id.*).

In summary, the ALJ concluded that Paul did not suffer from a disability between the

alleged onset date of October 23, 2016, and January 23, 2019, within the meaning of

§ 1614(a)(3)(A) of the Social Security Act.  (*Id.* at 1627).

**D.**     **Plaintiff's Objections**

Paul raises two principal objections to the ALJ's decision:  (1) that the ALJ erred by failing to resolve a conflict between the occupational evidence provided by the VE and the information in the DOT before relying on the vocational evidence, and (2) that the ALJ failed to provide a reasonable explanation for how an individual restricted to an RFC that is inconsistent with light work can perform the three "light" jobs identified in his decision.

**1.**     **Alleged Conflict Between the Occupational Evidence Provided by the VE and the Information in the DOT**

Paul first contends that the ALJ erred by failing to resolve a conflict between the occupational evidence provided by the VE and the information in the DOT before relying on the vocational evidence.  Specifically, she contends that the VE's testimony that an individual with her limitations can perform work as a bench inspector, tagger/labeler, or small products assembler is inconsistent with the DOT's functional requirements for those positions.  She thus alleges that the ALJ's failure to recognize the discrepancies and seek an explanation from the VE means that the ALJ's disability determination is unsupported by substantial evidence.

As noted, in order to find a claimant not disabled at step five, the Commissioner has the burden of establishing that there is work existing in significant numbers in the national economy that the plaintiff can perform with his or her RFC.  20 C.F.R. §§ 404.1520(a), 404.1520(g), 404.1560(c), 416.920(a), 416.920(g), 416.960(c).  The applicable regulation, SSR 00-4p, provides:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT.  When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled.  At the

> hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.  Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00–4p; *see also Szumylo v. Astrue*, 815 F. Supp. 2d 434, 440 (D. Mass. 2011).

Thus, SSR 00-4p "makes clear that an ALJ need only resolve conflicts between evidence provided by a VE and the DOT when the inconsistency is apparent and has been identified." *Sullivan v. Colvin*, 2015 WL 1308695, at \*13 (D. Mass. Mar. 24, 2015); *Policy Interpretation Ruling:  Titles II and XVI:  Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability* Decision, SSR 00–4p, 2000 WL 1898704, at \*2 (S.S.A. Dec. 4, 2000) ("When there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation . . . ."); *see also Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (SSR 00–4p "requires an explanation only if the discrepancy was 'identified' . . . ."); *Carey v. Apfel*, 230 F.3d 131, 146–47 (5th Cir. 2000) ("[C]laimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.").

Here, there is no indication in the record that Paul's attorney objected to the expert testimony or identified any discrepancies during the hearing.  (A.R. 1657-61).  In fact, immediately after Paul's attorney concluded questioning the VE, the ALJ asked the VE, "Is this testimony you provided consistent with information found in the Dictionary of Occupational Titles and [its] companion publication, Selected Characteristics of Occupations in the revised DOT and your experience?"  (A.R. 1661).  The VE answered in the affirmative.  (*Id.*).

Therefore, even assuming the existence of an inconsistency, that inconsistency was not identified, and therefore there is no violation of SSR 00-4p.

In any event, as discussed below, there is no conflict between Paul's RFC and the DOT's functional requirements for the three identified positions.

### i.   <u>**Bench Inspector and Tagger/Labeler Positions**</u>

Paul contends that according to the VE, the jobs of bench inspector and tagger/labeler are classified as light jobs because the work is done at a rapid pace.  She also notes that her RFC of "light" work is limited to simple, routine, repetitive tasks, and that she has a moderate limitation in concentrating, persisting, or maintaining pace due to her depression.  Thus, she contends, her limitations render her incapable of preforming the rapid, production-pace work required of those two jobs.  Specifically, she argues that (1) the ALJ's finding that she can perform simple, routine, and repetitive tasks over an eight-hour workday with a normal break schedule is inconsistent with jobs requiring a production pace, and (2) the ALJ's determination that she is unable to perform repetitive postural movements is facially inconsistent with rapid, production-paced work.  She emphasizes that the ALJ relied on Dr. Nairus's opinion that she is unable to perform any repetitive bending or stooping when he determined that she was unable to perform repetitive postural movements.

As an initial matter, Paul has misstated the VE's characterization of the physical requirements of these two positions.  She incorrectly contends that the VE testified that the bench inspector and tagger/labeler positions were light jobs, even though a person is sitting most of the time, because the work was rapid.  But as the Commissioner correctly noted, the VE testified that these were classified as light jobs due to both "the pace of the work *and* the occasional [lifting of] up to 20 pounds."  (A.R. 1654) (emphasis added).  Thus, her assumption that the bench

inspector and tagger/labeler positions were categorized as light because they "require[] working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible" is incorrect.

In any event, a limitation to "simple, routine, and repetitive tasks" does not automatically preclude a person from being able to work at a production-paced rate. And based on the DOT's description of those two positions, there is no evidence in the record for that claim. *See* DOT § 229.587-018; DOT § 741.687-010. "A direct and obvious conflict exists when the VE's characterization of the exertional or skill level required for a particular job is facially different from the exertional or skill provided for that job in the DOT." *Szumylo v. Astrue*, 815 F. Supp. 2d 434, 441 (D. Mass. 2011) (quoting *Cooper v. Commissioner of Social Sec. Admin.*, 2011 WL 61613, at *7 (N.D. Tex., Jan. 6, 2011)). Here, there is no apparent conflict between the VE's testimony and the DOT that should have been resolved by the ALJ under his SSR 00-4p obligations.

Paul also contends that because there is a third definition of "light" work that concerns production rate work—"requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible"—it necessarily follows that production-paced work is distinguishable from routine work. But there is nothing to suggest or support this perceived dichotomy. When the agency and courts refer to "simple, routine and repetitive tasks but not at a production rate pace," the "but not at a production rate pace" represents a qualifier to "simple, routine, and repetitive tasks," rather than indicating that the two terms are mutually exclusive.

Furthermore, even if the positions of inspector and tagger/labeler do require production-paced work, Paul has not demonstrated that she is incapable of this type of work based on her

RFC.  There is no evidence in the record to suggest that her inability to perform repetitive

postural movements is facially inconsistent with rapid, production-paced work.

Paul miscredits Dr. Nairus's medical opinion as the decisive reason for the ALJ's

determination that she "can perform simple, routine and repetitive tasks."  The ALJ's statement

that she could not perform repetitive postural movement was made in connection with Dr.

Nairus's opinion that she could not "perform any repetitive bending or stooping."  (A.R. 1625).

In the context of RFC limitations, postural movements typically refer to activities such as

bending, squatting, turning, balancing, kneeling, crouching, or crawling.  *See Bragdon v.

Berryhill*, 2018 WL 5257605, at *6 (S.D. Fla. Oct. 22, 2018) ("no repetitive postural movements

(such as bending, squatting, kneeling, stooping, twisting, or turning)"); *Miley v. Colvin*, 2015

WL 4113707, at *3 (D. Colo. July 8, 2015) ("Dr. Borja opined that plaintiff was able to:  . . . . do

routine, but not repetitive, postural activities such as bending, squatting, stooping and

crouching."); SSR 96-9p, 1996 WL 374185, at *7 (S.S.A. Jul. 2, 1996) ("Postural limitations or

restrictions related to such activities as climbing ladders, ropes, or scaffolds, balancing, kneeling,

crouching, or crawling would not usually erode the occupational base for a full range of

unskilled sedentary work significantly because those activities are not usually required in

sedentary work."); SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, at *6-7 (S.S.A. Jan. 1, 1985)

("Postural-Manipulative Impairments a) Limitations in climbing and balancing . . . b) stooping,

kneeling, crouching, and crawling . . . c) reaching, handling, fingering, and feeling.").

The ALJ thus considered and accounted for Dr. Nairus's opinion in his determination of

Paul's RFC, which declared that she "cannot climb ladders, rope or scaffolding . . . can

occasionally kneel, stoop, balance, crouch, crawl, and climb stairs and ramps."  (A.R. 1619).

Furthermore, when posing the various hypotheticals to the VE during the oral hearing, the ALJ

explicitly stated that the hypothetical individual "cannot climb ladders, ropes or scaffolding" and also "can occasionally kneel, stoop, balance, crouch, crawl and climb stairs and ramps." (*Id.* at 1652). Thus, when identifying the jobs of bench inspector and tagger/labeler, the VE considered her inability to perform repetitive postural movements, and still found that she could perform rapid-paced work.

Accordingly, although Paul contends that the positions of bench inspector and tagger/labeler are production-paced work and that she is incapable of such work, the ALJ's decision is supported by substantial evidence and does not warrant reversal.

### ii.     Small Products Assembler Positions

Paul next contends that the ALJ's finding that she can perform work as a small products assembler is not supported by substantial evidence. Specifically, she argues that her limitation of walking and/or standing for two hours in an eight-hour workday precludes her from meeting the requirements of a small products assembler job, because such a job requires "a good deal of walking or standing." She arrived at this assumption by using a "process of elimination," reasoning that because (1) there is no evidence that the job requires significant pushing and/or pulling of arm or leg controls or handling of weights up to twenty pounds, and (2) the VE testified that this is not a production-paced job, therefore (3) the job must require the assembler to be on his or her feet for up to six-hours out of an eight-hour work day.

The DOT assigns a "light" exertion level to the position of small products assembler. *See* DOT § 712.687-010. According to the DOT, jobs are generally classified as "light" when the individual is:

> Exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly (Constantly: activity or condition exists 2/3 or more of the time) to move objects. Physical demand requirements are in excess of those for Sedentary Work. Even though the weight

lifted may be only a negligible amount, a job should be rated Light Work:  (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time but entails pushing and/or pulling of arm or leg controls; and/or (3) when the job requires working at a production rate pace entailing the constant pushing and/or pulling of materials even though the weight of those materials is negligible.  NOTE:  The constant stress and strain of maintaining a production rate pace, especially in an industrial setting, can be and is physically demanding of a worker even though the amount of force exerted is negligible.

Social Security Program Operations Manual System ("POMS") § DI 25001.001(A)(43).  A

"light" designation alone does not establish that the job requires substantial standing or walking.

*See id.*

Plaintiff's use of a "process of elimination" to establish that small products assembler

jobs are categorized as "light" because they require the ability to walk or stand for six hours a

workday is unpersuasive.  The DOT description for that occupation is silent as to which aspects

of the "light" definition it fulfills or does not fulfill.  *See* DOT § 712.687-010.  Moreover, there is

no evidence to support the assertion that the job is categorized as "light" because it requires

walking or standing to a significant degree.  On the contrary, the hypothetical the ALJ presented

to the VE expressly included a two-hour standing/walking limitation.  (A.R. 1654-55).  The VE

specifically accounted for that limitation by testifying that of the 250,000 small product

assembler positions available in the national economy, approximately 10% would allow for more

than six hours of sitting, yielding an estimate of 25,000 positions in that category.  (*Id.* at 1655).

In short, there is no actual inconsistency between Paul's limitations and the requirements

of the small products assembler jobs.  The VE provided substantial evidence upon which the ALJ

could rely in finding that such jobs exist in significant numbers in the national economy that Paul

can perform.

Paul's additional argument that the VE should have provided a copy of the "Occupational

Requirement Survey" to ensure its reliability is likewise unpersuasive.  The VE cited the survey when testifying that 68% of small products assemblers can sit at will.  (A.R. 1654).  It is well-established, however, that a VE's testimony can constitute substantial evidence even if she does not produce her survey data.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1156 (2019) (holding that the ALJ could rely on the testimony of a VE, even though she refused to provide the underlying data, because her testimony itself constituted "substantial evidence"); *Newman v. Saul*, 2020 WL 4049915, at *16 (D. Mass. July 17, 2020) ("The VE in the present case and the VE in Biestek explained their testimony with evidence that only would be accessible to them, experience and private surveys, respectively.  This was acceptable in *Biestek*, so it follows that it is likewise acceptable here.").

Paul's argument that the ALJ erred by relying on the availability of a sit/stand option for small products assembler jobs (to compensate for a requirement that an individual be able to stand for more than two hours over the course of a workday) is also without merit.  There is no evidence that all small products assembler positions require more than two hours of standing/walking.  And the VE's calculation of the number of potential jobs that comported with Paul's limitations did not depend on the existence of a sit/stand option.  Instead, the VE specifically contemplated the estimated amounts of time an individual would be required to stand or walk (as opposed to sit) when identifying the limited number of small products assembler jobs.  (A.R. 1655).

Likewise, Paul's contention that her restricted ability to stand also inhibits her ability to lift and carry, and therefore she would be unable to perform the lifting and carrying requirements of the small products assembler job, is without merit.  The hypothetical posed to the VE included both her capacity to lift and carry as well as her limitation of only two hours of standing and

walking a day.  (A.R.  1652-53).  In his decision and in the hypotheticals presented to the VE, the ALJ specifically considered that Paul had a "light" RFC that incorporated a two-hour standing/walking limitation and ability to lift and carry twenty pounds occasionally and ten pounds frequently.  *Compare Saeed v. Berryhill*, 2018 WL 1243953, at *10 (D. Mass. Mar. 9, 2018) (finding that "although neither party has specifically addressed this concern, the ALJ did not appear to consider, either in his decision or in posing the hypotheticals to the VE, that an RFC incorporating a two-hour standing/walking limitation but otherwise adopting the capacity to perform light work presents a potential inconsistency").  Moreover, as noted, the VE considered Paul's walking/standing restriction, as well as her other limitations, and reduced the number of available small products assembler positions to reflect those limitations.

In summary, there were no conflicts between the VE's testimony and the DOT.  The ALJ properly found that Paul could perform the jobs of bench inspector, tagger/labeler, and small products assembler.  Accordingly, the Court thus finds that the Commissioner has satisfied his burden of proving that significant work exists in the economy that Paul can perform.

### 2.     Alleged Failure to Provide Reasonable Explanations

Paul next contends that the ALJ failed to provide any reasonable explanation for how an individual who has an RFC that is inconsistent with light work can perform the three "light" jobs identified in his decision.

As noted, even if Paul's attorney had raised those alleged conflicts at the administrative hearing, there would still be no cause for remand, because there is no actual conflict between the VE's testimony and the DOT.  SSR 00–4p, 2000 WL 1898704, at *4 (S.S.A. Dec. 4, 2000) (SSR 00–4p requires that "when vocational evidence provided by a [vocational expert] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying

on the [vocational expert] evidence to support a determination or decision that the individual is or is not disabled"); *see Sullivan*, 2015 WL 1308695, at *13 (D. Mass. Mar. 24, 2015) ("In this case, there is no indication that plaintiff's attorney objected to the expert's testimony or identified the discrepancy at the oral hearing. (A.R.63–64). Because the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict."); *Aho v. Commr. of Social Sec. Admin.*, 2011 WL 3511518, at *14 (D. Mass. Aug. 10, 2011) ("Plaintiff contends that the ALJ failed to resolve inconsistencies in the jobs offered by the vocational expert and plaintiff's visual and no-dangerous-machinery restrictions. Because the inconsistency was not identified during the hearing, the ALJ was not required to explain the conflict.").

### 3. Allegations that the ALJ Erred in his RFC Determination

Finally, Paul contends that the error was case-determinative because she turned 50 on July 10, 2018. She maintains that her RFC, which restricts her to only two hours of standing or walking a day, limits her to only "sedentary" work, and makes her unsuitable for "light" work. If the ALJ had found that she was a 50-year-old person limited to "sedentary" work, he would have been required to make a finding of "disabled" under the Medical-Vocational Guidelines (the "Grid rules").

The Social Security Administration Program Operations Manual System ("POMS") provides, in relevant part:

> RFC represents the most that an individual can do despite his/her limitations or restrictions. At step 5 of the sequential evaluation process, RFC must not be expressed in terms of the lowest exertional level (e.g., "sedentary" or "light" when the individual can perform "medium" work) at which the medical-vocational rules would still direct a finding of "not disabled." This would concede lesser functional abilities than the individual actually possesses and would not reflect the most he/she can do based on the evidence in the case record, as directed by the regulations. The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC . . . . Careful

> consideration must be given to any available information about symptoms
> because subjective descriptions may indicate more severe limitations or
> restrictions than can be shown by objective medical evidence alone.

SSA POMS § DI 24510.006 (C)(3), (C)(5), *Assessing Residual Functional Capacity (RFC) in Initial Claims*, SSR 96-8P.

It is well-established that "[t]he credibility determination of the ALJ, who observed the claimant, evaluated [her] demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings." *Church v. Astrue*, 2012 WL 369424, at *9 (D. Mass. Feb. 2, 2012) (quoting *Frustaglia v. Sec'y of Health & Human Srvs.*, 829 F.2d 192, 195 (1st Cir.1987)). Where there are inconsistencies in the record, the ALJ may discount subjective complaints of pain. *Underwood v. Bowen*, 807 F.2d 141, 143 (8th Cir.1987); *Church*, 2012 WL 369424, at *9.

The ALJ's RFC determination that Paul can perform light work is supported by substantial evidence. The ALJ considered the entire medical record when determining her RFC. (A.R. 1619-25). In particular, he noted that her statements about the severity and limiting effects of her back disorder were inconsistent with the objective medical record. He noted that there was a lack of consistent treatment for her back condition, which did not support her allegations as to the severity of her condition, and that the results of physical examinations were not consistent with her significant symptom allegations. (*Id.* at 1623-24). Furthermore, while Paul used a cane, it was not clear if it had been prescribed by a medical provider. (*Id.* at 1624).

The various examinations of Paul's gait and muscle strength, tone, and size indicated that they were all normal. (*Id.*). Moreover, the MRI taken before the accident and the one taken after the accident did not show significant changes in her condition and only demonstrated mild findings. (*Id.*). Both Dr. Nairus and Dr. Rockett suggested that some of Paul's symptoms may

have been magnified or exaggerated.  (*Id.*).  Accordingly, the ALJ concluded that there was no objective indication that Paul could not meet the physical demands of a reduced range of light work.  (*Id.*).

With respect to her mental impairments, the ALJ considered the medical records and reports, which included information that she had not received significant, if any, treatment for depression, that she had never been hospitalized for depression, that there were no significant abnormalities in her cognitive functioning, thought processes, thought content, or speech, and that she appeared to be managing the symptoms of her mental impairment through conservative care and prescription medication.  (*Id.*).  She also reported that she has a young child in her care and that she occasionally cooked and enjoyed reading and listening to music.  (*Id.*).

In summary, the ALJ's conclusion that she was capable of "light" work with certain limitations was supported by the evidence.  The ALJ accounted for those limitations, and Paul's contention that her limitation to only two hours of standing or walking a day limits her to only "sedentary" work and makes her unsuitable for "light" work is unpersuasive.

## III.  <u>Conclusion</u>

For the foregoing reasons, plaintiff's motion for an order to reverse and remand the final decision of the Commissioner of the Social Security Administration is DENIED, and defendant's motion to affirm the action of the Commissioner is GRANTED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  February 26, 2021                         Chief Judge, United States District Court